COMMONWEALTH FIRE INS. CO. v. OBEN-CHAIN et al.

(Court of Civil Appeals of Texas. San Antonio. Nov. 6, 1912. Rehearing Denied Dec. 4, 1912.)

1. MORTGAGES (§ 480*)—FORECLOSURE—SUFFICIENCY OF EVIDENCE—PAYMENT.

In an action to foreclose a deed of trust, in which defendant counterclaimed for insurance due him on account of loss by fire, evidence *held* to present a question for the jury whether the mortgagee, a fire insurance company, undertook and agreed to attend to the insurance, and did attend to it for a time in such manner as to give the mortgagor the right to believe it would continue to do so.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 1399; Dec. Dig. § 480.*]

2. INSURANCE (§ 328*)—FORFEITURE—CHANGE OF TITLE OF INTEREST.

A mortgagee, a fire insurance company, agreed to attend to the insurance on the premises and did for a time, justifying the mortgagor in believing that it would continue to do so. The policies while kept in force were made for only one year at a time. The form of policy customarily used by the company contained a provision that it would be void if any change in the title or possession of the premises took place. The mortgagor conveyed as security for a debt, but the premises were reconveyed, and more than two years thereafter a loss occurred. *Held*, that the conveyance did not affect the company's liability, since it was fair to assume that, if it had continued to have

policies issued, they would have been for only one year, and an act avoiding one policy would not avoid subsequent policies.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 794–822, 825; Dec. Dig. § 328.*]

3. INSURANCE (§ 113*)—PROVISIONS OF POLICY—NOTICE TO INSURED.

Where a mortgagee agreed to attend to the insurance on the mortgaged premises, and procured policies of insurance thereon and retained them in its possession, the mortgagor was chargeable with notice of their provisions.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 135; Dec. Dig. § 113.*]

4. INSURANCE (§ 362*)—NONPAYMENT OF PREMIUMS—EXCUSE.

A mortgagee, a fire insurance company, whose mortgage required the premises to be kept insured, and authorized the mortgagee to pay insurance premiums and recover them from the mortgagor with interest, agreed to attend to the insurance, and for some time did so. There was no evidence that the mortgagor had paid any premiums to the local agents, and the president of the company testified that the insurance was dropped, not because of the nonpayment of premiums, but because by a payment on the loan the premises constituted sufficient security without insurance. The mortgagor was never notified that the company would no longer attend to the insurance. *Held*, that the mortgagor's failure to pay a premium when notified by a local agent that it was due did not relieve the company from liability.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 925–930; Dec. Dig. § 362.*]

5. TRIAL (§ 192*) — INSTRUCTIONS — ASSUMPTION OF FACTS.

Where it appeared that the president of an insurance company, also named as the trustee in a deed of trust given to the company, in negotiating the loan, insisted that the insurance should be carried in his company, the court did not err in treating it as undisputed that the company selected itself to carry the insurance.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 432–434; Dec. Dig. § 192.*]

6. APPEAL AND ERROR (§ 1066*)—REVIEW—HARMLESS ERROR—INSTRUCTIONS.

Where it was claimed that an insurance company had agreed to attend to keeping the premises insured, an instruction requiring notice to, or knowledge by, "defendants" that it would no longer attend to the matter in order to relieve it of liability was not prejudicial to the company, although it required notice to, or knowledge by, insured's wife as well as insured, where there was no contention that either one had notice or knowledge.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4220; Dec. Dig. § 1066.*]

7. EVIDENCE (§ 139*)—ADMISSIBILITY—SIMILAR TRANSACTIONS.

Where defendant gave two deeds of trust on different lots to plaintiff, an insurance company, and a recovery for loss by fire on one of the lots was sought on the theory that the company had agreed to attend to the insurance on the premises, the testimony of a person purchasing the other lot, subject to the deed of trust, that the company without any request from him issued a policy and sent him a bill for the premium, was admissible to show its course of dealing with respect to the property and to show how it construed its transaction with respect to the insurance thereon.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 415; Dec. Dig. § 139.*]

Appeal from District Court, Dallas County; J. C. Roberts, Judge.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Action by the Commonwealth Fire Insurance Company against H. L. Obenchain and others. From a judgment for defendants, plaintiff appeals. Affirmed.

Coke, Miller & Coke, of Dallas, for appellant. W. P. Ellison, W. H. Clark, Ed. Dougherty, and Cockrell, Gray, Thomas & McBride, all of Dallas, for appellees.

MOURSUND, J. This is a suit by appellant against appellees for $1,500, together with interest and attorneys' fees, balance due on note, dated April 1, 1904, executed by appellees to appellant, and to foreclose lien on a part of block 525 in the city of Dallas, existing by virtue of a deed of trust executed by appellees to I. Jalonick, as trustee for appellant, to secure the payment of said note. Defendants admitted plaintiff's claim, but set up a cross-action alleging that plaintiff was indebted to defendants at the time of the filing of the suit in the sum of $1,600 on account of fire loss; that on April 1, 1904, plaintiff made defendant H. L. Obenchain a loan of $7,500, for which Obenchain executed two notes, one for $5,000, secured by deed of trust on a lot on which was situated a one-story brick house, and the other for $2,500, secured by deed of trust upon the premises described in plaintiff's petition, on which at that time was situated a two-story frame building; that the debt sued for by plaintiff is the balance due on said $2,500 note. It was further alleged that, at the time of making said loan, the houses above mentioned were insured in other companies, but that plaintiff company, through its president and the trustee in said deeds of trust, Isaac Jalonick, required defendants to give the insurance upon said buildings to plaintiff company, insisting that said company was in the insurance business as well as in the loan business, and that it must have the insurance, and that the loan would not be consummated unless the insurance was carried by plaintiff company; that plaintiff then and there agreed with defendants that it would carry the insurance on said two buildings for their mutual benefit and Isaac Jalonick, trustee, as his interest might appear; that plaintiff company prepared the deeds of trust given to secure said loan, and the one covering the premises described in plaintiff's petition contained the following clause: "That we will keep the buildings on said premises, or that may hereafter be erected thereon, insured in such company or companies as said trustee (I. Jalonick) may select, to the amount of $1,600, with loss, if any, payable to the legal holder or holders of said note as its interest may appear; that we will keep all fences, buildings, and other improvements thereon in good repair and will do no act by which the value of said premises may be impaired, and that we will on demand repay the legal holder or holders of said note, or trustee, all sums of money they may advance to satisfy, and pay taxes,

assessments, insurance premiums, and charges of whatever nature chargeable against said premises or against said note or this deed of trust, with 10 per cent, interest per annum from date of advancement, all said advancements to be a lien on the property hereby conveyed and secured by this deed of trust." It was further alleged that the other deed of trust contained the same clause, except that it provided for a different amount of insurance to be carried; that the matter of insurance was thereby taken out of defendants' hands, allowing them no option in the matter, and providing for paying itself all premiums and securing itself therein; that said trustee, who was, and ever since has been, the president of plaintiff company, selected said company to carry the insurance risks, and did insure said houses, and led defendants to believe, and they did believe, that said houses were insured, the brick building as long as defendant H. L. Obenchain owned same, and the frame building on September 17, 1909, when it was destroyed by fire; that, by reason of the premises, plaintiff company is indebted to defendants on its policy to the amount of $1,600. It was further alleged that if said policy on said frame building had lapsed, as claimed by plaintiff, then that plaintiff undertook and agreed to insure the same and keep it insured to the extent of $1,600, and to protect itself and the defendants to that extent, and constituted itself the agent of the defendants, protecting and securing itself in the payment of all insurance premiums, and required defendants to agree to same, and that the policies were retained by plaintiff company; that defendants were left no choice, and relied upon said undertaking on the part of plaintiff to insure said property from year to year, and, if it was not insured, then it was through the negligence, wrong, and breach of agreement on the part of plaintiff company, whereby defendants have suffered damage and loss to the amount of $1,600; that said acts and agreements by plaintiff constituted an insurance by it of these defendants against all loss by fire to the extent of $1,600, whether any formal policy was issued or not. Defendants further alleged they had paid all premiums on notice that they were due; that, as plaintiff kept the policies, defendants had no record of expiration dates, and relied wholly on plaintiff to insure the property as it had agreed to do, and plaintiff at no time gave defendants any intimation of any change of plans or policy.

Plaintiff filed a supplemental petition containing demurrer, general denial, and plea that on April 1, 1904, and continuously since said date, the form of insurance policy, customarily in use by plaintiff and other companies, contained, in substance, the following provision: "That said policy, unless otherwise provided by an agreement indorsed thereon or added thereto, shall be void, if

the hazard be increased by any means within the control or knowledge of the insured, or if mechanics be employed in building, altering or repairing the insured premises for more than 15 days at any one time, or if the interest of the insured be other than unconditional and sole ownership, or if any change other than by the death of the insured take place in the interest, title, or possession of any part of the subject of insurance, except change of occupants without increase of hazard, whether by legal process, or by judgment, or by voluntary act of the insured or otherwise, or if the building mentioned and described in said policy, whether intended for occupancy by owner or tenant, be or become vacant and unoccupied, and so remain for 10 days." It was further alleged that defendant H. L. Obenchain executed and delivered to W. H. Flippen, as trustee for J. B. Adoue, a deed of trust on the premises described in plaintiff's petition, dated July 26, 1904; that about October 1, 1906, he executed and delivered to J. T. Elliott a general warranty deed to the lot on which said two-story frame house was situated; that plaintiff never received any notice of the execution of either of these two instruments; that the said two-story frame house became vacant and so remained for more than 10 days at a time at various periods; that several times between April 1, 1904, and the date of the fire mechanics were employed in altering and repairing said building for more than 15 days at one time; that plaintiff was never notified of said vacancies or alterations or repairs, and had no knowledge thereof, and, if plaintiff had issued any policies on said house, same would have contained the provision aforesaid. Plaintiff also pleaded the statutes of limitation of two and four years. Defendants filed supplemental answer containing demurrer and special exceptions to the supplemental petition, a general denial, a special plea setting up that at the time of the fire, and for more than two years prior thereto, the defendants were the bona fide owners of said property, and that same was unincumbered except as to plaintiff's lien.

Upon the trial, the jury on June 2, 1911, returned a verdict against plaintiff, and in favor of defendants on their cross-action for $45, with interest thereon from September 17, 1909, to date. Judgment was entered September 13, 1911, nunc pro tunc as of June 2, 1911, that plaintiff take nothing by its suit, and that defendants recover of plaintiff $45 with interest from date. Plaintiff appealed.

The first assignment of error complains of the refusal to instruct a verdict for plaintiff as against defendants' cross-action. The propositions, briefly summarized, are that the evidence was insufficient (1) because it fails to show it was plaintiff's legal duty to defendants, or either of them, to have insurance on said building at the time of the fire to the extent of $1,600, or any other sum; (2) because by conveyance made by defendants to Elliott in October, 1906, the policy then on the property was vitiated, and plaintiff was under no obligation to renew same upon its expiration or upon the reacquisition of title by Obenchain and wife; (3) because, when defendants reacquired the title, plaintiff was under no obligation to reissue policy until advised by defendants of such reacquisition of title by them, with a request for the issuance of another policy.

[1] The execution and delivery of the two deeds of trust and the notes described in defendants' cross-action is admitted. The deeds of trust contained the clause copied in our statement of defendants' cross-action. The loans were made on April 4, 1904. On December 26, 1905, there was paid on the $2,500 note the sum of $1,000. At the time of the loan, the houses on the two pieces of property mentioned in said deeds of trust were insured in other companies than plaintiff company. On January 4, 1905, Chas. L. Dexter, local agent for plaintiff, insured the two-story frame building, and upon the expiration of the policy on January 4, 1906, D. M. Craddock, the successor of Dexter as local agent, renewed same for another year; the policy being written in the name of the estate of A. T. Obenchain. Craddock testified the premium was never paid to him, and the insurance was dropped at the expiration of said policy on January 4, 1907, and no subsequent policy issued. That he thought he gave the policy to plaintiff company, and, according to his recollection, the same contained a reservation of plaintiff's interest as the same might appear. He did not get the order for the insurance from defendant H. L. Obenchain nor deliver policy to him. Defendant H. L. Obenchain testified that he was the owner of the premises described in plaintiff's petition, and that the house on same was almost entirely destroyed by fire on September 17, 1909; the damage amounting to over $2,000. He then testified: "At the time I executed the deed of trust, the property was insured in one of Mr. Addison's companies; I don't know the name of the company, never did know. When I made this loan with Mr. Jalonick, we had a conversation about the insurance, and then, after it was consummated under his instructions, I informed Mr. Addison that Mr. Jalonick had charge of my insurance thereafter, and he would have to give it up to him. The conversation with Mr. Jalonick took place after the loan was all agreed to. He says, 'Mr. Obenchain, we are in the insurance business as well as in the loan business, and we will have to have the insurance on that property,' and I told him I preferred to attend to that myself. He says, 'Don't make any difference; the loan wouldn't be made unless we have the insurance; we are in

the insurance business as well as the loan business,' and I had arranged to use this money here in releasing the estate from the administration, and the court was ready and I had to put loans on it." (This evidence appears to have been limited by the court to be admitted only for the purpose of showing the facts in regard to the selection of the company in which the insurance should be placed.) Again the witness testified: "I agreed that Mr. Jalonick should notify the other company that he was to take the insurance; that is all. He stated, as I said, that they were in the insurance business as well as the loan business, and that they would have to have the insurance on that property. He selected his own company; I understood him to select. He said, 'We will have to have that insurance;' that is, the Commonwealth Insurance Company. * * *" Then: "Mr. Jalonick kept the policies, * * * had them issued or attended to the issuing of them, and kept the custody of them. I told him in this conversation that I preferred to attend to my own business, but he told me that they had to have that insurance, and that was all there was to it; I never had anything more to say about it." He also testified to having another conversation over the telephone with I. Jalonick, the president of plaintiff company and trustee in said deeds of trust, after the fire; a portion of his testimony concerning said conversation being as follows: "I says, 'Well, Mr. Jalonick, you remember when you made me the loan that you informed me that you were in the insurance business as well as in the loan business, and that you would have to have the insurance on that property?' He says, 'Yes.' I says, 'Well, is my property insured?' He says, 'Why, yes.' I says; Well, where is my policy?' I says, 'I can't find it,' or something. He says, 'Well, I will find it for you.' I says, 'Well, I am very pleased to hear that, Mr. Jalonick.' I says, 'I started to write you.' He then asked if I had had a loss, and I told him 'Yes'; that I moved out of the house on the 1st day of September, and it burned up on the 17th. He asked how long it was vacant. I told him it was not vacant a minute; that I moved out and the other people moved in. He asked if the other people had any insurance. I told him I didn't know; that I heard they did. He asked how much. I told him I understood $1,000, and he says, 'All right.' I asked him if he would get my policy for me, and he replied he would." That next day Jalonick called for him over the telephone at his residence, in his absence, and, upon his return, being informed of such fact, he rang up Jalonick and told him who he was.

We now quote from Obenchain's testimony in regard to this conversation: "He said, 'Oh, yes,' and hesitated and hummed and hawed a minute, and then says, 'Why, when you were speaking to me the other day, I thought you were speaking of an investment.' I told him I didn't know what he meant by investment; that I just wanted to know if he had my insurance as he had agreed to carry, and he said that I was not insured. I asked why not, and he replied that they weren't attending to my business for me. I told him that it looked like he undertook to attend to it when he made me take it away from my agents and turn it over to him, and he replied that I wasn't insured, and they weren't going to pay a dollar of it. I told him that it looked to me like he ought to settle up my insurance, and finally remarked that it wasn't any use for us arguing a lot. He said, We carried your insurance up until January, 1906, and at that time you made a payment of $1,000 on your note, and we didn't care for any further security and we just dropped the insurance.' I told him I didn't know anything about that, and he said, 'We will see about that,' or something of the kind, and then I told him my wife had paid him $1,000, and he wouldn't say that he had ever taken the $1,000; he wouldn't say that he had ever said anything to my wife about insurance or anything of that kind, and finally wound up and told me that he didn't owe me a dollar, and wasn't going to pay me a dollar."

It appears from the evidence of B. R. Parks, who purchased the premises conveyed in the deed of trust securing the $5,000 note, that the brick building thereon was insured by plaintiff company in March, 1908, when he bought it. He assumed the payment of said note, and some months after his purchase received a notice from plaintiff that it had rewritten his insurance, and inclosed bill for premium, all without any request from him; that he did not want to carry insurance, because he wanted to tear down the building, and, after receiving the second notice, called on Mr. Jalonick and objected to paying premium. The witness then testified as follows: 'Mr. Jalonick said that, under this loan, the contract or deed of trust provided they had the exclusive right to keep this property insured; that I had always had my own way about things, and now they had the exclusive right, and I had to pay the price, and I think, if I remember correctly, I had the policy on that property canceled and tore down the property and rebuilt and paid off the loan in October, 1908, some time."

I. Jalonick testified, in part, as follows: "I will tell you why the policy lapsed. * * * Dexter wrote it and Craddock renewed it. In December, 1905, the policy— that is, the loan—was paid down to $1,500. * * * The policy was written (I think Craddock wrote it) in 1906, and expired 1907. Well, I remember that policy had expired, the loan had been reduced to $1,500, and the real estate was ample security for $1,500; and that is why I was indifferent and didn't

think it was up to me to continue the policy on it, ask for that additional security, in addition to the land. The company was protected by the real estate, and I have something else to do besides write up renewals of 5,000 or 6,000 policies. We took this contract from Harry Obenchain empowering me to select the company for renewals to protect the loan as long as the loan needed protection. * * * It was up to Mr. Obenchain to protect his insurance; that was his affair. I represented the company; I didn't represent Mr. Obenchain."

It appeared from policy register of Mr. Addison, deceased, that he issued policy for $1,500 on the two-story frame house in favor of estate of A. T. Obenchain for one year, expiring January 4, 1905, with mortgage clause in favor of Guarantee Loan & Investment Company, and on May 30, 1904, after the deed of trust to plaintiff in April, rider was attached showing satisfaction of interest of said Loan & Investment Company, and showing loss payable to I. Jalonick as his interest might appear. The evidence shows that Obenchain on October 1, 1906, executed to J. T. Elliott a warranty deed conveying said premises, reciting a consideration of $8,000, of which $6,500 was cash, and the remainder the assumption of the balance of $1,500 due plaintiff on its note. Jalonick testified he did not know of said instrument until after the fire. Obenchain made this conveyance to Elliott partly for the purpose of getting money to pay his interest, and partly to make a prospective purchaser more eager to buy the place. Elliott let him have $260, which he paid to Jalonick. Obenchain testified that he considered himself the owner of the property all the time. Jalonick testified the blank form of insurance policy introduced in evidence was the form customarily used by the plaintiff for many years. This form contains the clause copied by us in stating the allegations of plaintiff's supplemental petition. We think the evidence was sufficient to go to the jury, and that, if the jury believed the testimony of defendant H. L. Obenchain, it was authorized to find against appellant on the ground that, through its president, it undertook and agreed to attend to defendants' insurance matters, and did attend to same in such manner as to give him the right to believe they would continue to do so.

[2] Nor do we think the execution of the deed to Elliott, which appears to have been intended as a mortgage, will excuse appellant from liability. If the fire had occurred during the time when this conveyance was in effect, it might be a serious question, but the fire occurred in September, 1909, about two years after the reconveyance by Elliott. Jalonick testified they insured the house only for one year at a time; that it was cheaper to insure for three years, as it would only cost two premiums; and that he supposed it was not insured for three years at a time

"because Mr. Obenchain didn't want it that way—didn't ask for it." Assuming that any policies issued would have been only for one year, as we think, from the testimony, we have a right to do had appellant issued such policies in accordance with the agreement with Obenchain, the one in force on September 17, 1909, would not have been subject to any objection by reason of the condition of the title, and payment thereof could not have been refused because of some act invalidating a prior policy, even though the existence of such prior act was unknown to appellant. Appellant had a lien on the premises to secure the payment to it of all premiums paid by it, together with 10 per cent. interest, which was a greater rate of interest than the loan itself bore, and could have recovered such premiums in this suit by pleading and proving same.

[3] While we think Obenchain was chargeable with notice of the provisions of the policy, even though same was not in his possession, yet we do not think that an act by him which would avoid one policy should be construed to avoid all subsequent policies. For the reasons indicated, we overrule the first assignment.

[4] The second assignment complains of the refusal to give a special charge, reading as follows: "If you believe from the evidence that defendant H. L. Obenchain received notice from D. M. Craddock, local agent of plaintiff, that a premium was due on the policy issued by said Craddock January 4, 1906, and said Obenchain failed to pay said premium to plaintiff or said agent, then you will return a verdict for plaintiff on defendants' cross-bill or counterclaim." Appellee contends the evidence fails to show that notice of accrual of the premium was received by Obenchain, and for that reason the charge was correctly refused. We have read the statement of facts carefully, and conclude that the evidence on such point was sufficient to go to the jury. Appellee also contends the charge was correctly refused because it was immaterial whether such premium was paid or not; that Obenchain, under the facts of this case, had the right to depend upon plaintiff carrying his insurance until it notified him that it would no longer do so.

It is undisputed that Obenchain was never notified that plaintiff would decline to write further insurance on either of his two properties, or that it had declined to do so, and received no notice prior to the fire that the insurance had been dropped. He did nothing with respect to his insurance being changed to plaintiff company from the companies in which he carried it at the time of the loan, except to state to Addison, the agent, that Jalonick would look after his insurance in the future. The policies were issued by plaintiff company evidently by instructions from Jalonick. Jalonick reinsured on the date of its issuance the policy issued by Craddock on January 4, 1906, as

shown by certificate attached thereto. On the next day a change was indorsed on the policy making the name of the insured read H. L. Obenchain instead of estate of A. T. Obenchain. This indorsement is not signed by Craddock, nor did he recollect making same. Craddock had no dealings with Obenchain, and sent out his bills on the first of the succeeding month, so it is evident that Obenchain knew nothing of this mistake until long after it was corrected; and, as Craddock knew nothing about the ownership of the property, it is evident that some one in plaintiff's home office had this change made, and was at that time giving the matter supervision. Neither Dexter nor Craddock testified to ever having received any premiums on the Obenchain policies. Dexter did not know who paid the premium on the policy issued by him on the two-story frame building, nor did he testify it was paid to him. Jalonick testified that Obenchain never paid a cent on any premium on any insurance policy, and then qualifies by adding that he never paid any to the company direct; that all premiums were collected through local agents. Edwards, who was auditor, cashier, and chief clerk, testified that no premiums were paid to him by Obenchain on said property to the best of his recollection. Obenchain testified positively that he paid to plaintiff's home office all premiums of which he received notice. It is admitted that the premium was paid on the first policy issued on the two-story frame building; and, while policies were issued on the brick building as late as 1908, no one of plaintiff's witnesses, who were its officers or agents, admitted that Obenchain ever paid a premium thereon. The $1,000 was paid on the $2,500 note in December, 1905, before Craddock issued the policy on January 4, 1906, yet said policy was permitted to remain in force until January 4, 1907, although no necessity existed for doing so for the protection of plaintiff, as shown by the testimony of Jalonick, in explaining why the insurance was not renewed, and although bill was sent out on the first of the following month, and, according to Craddock's testimony, was not paid to him. If Obenchain's testimony is true, Jalonick, speaking for plaintiff company, insisted on having the insurance because they were in the insurance business, and that Jalonick himself thought they had been insuring the property all along, and assured Obenchain over the telephone after the fire that the policy was in force. It appears from Obenchain's testimony that after the fire he went to plaintiff's home office and saw Craddock, and no one could or would give him any information about his insurance, and he told Jalonick, when the latter returned to Dallas, that he had made such inquiry and asked him whether he still had insurance, and then Jalonick assured him the policy was in force. It also appears that Jalonick, again speaking for plaintiff, insisted upon keeping the policy upon the brick building in force after it had been sold, claiming such right because the deed of trust gave it, and the same was still in force; the indebtedness having been assumed by the purchaser.

We think the evidence shows such a course of dealing in regard to this matter as to make plaintiff liable to Obenchain, even if the latter failed to pay the premium on the 1906 policy, and that plaintiff could only have relieved itself of further liability by notifying him that it would no longer undertake to write his insurance. Aside from Jalonick's testimony giving his reason for dropping the insurance, the evidence fails to show that it was dropped for nonpayment of premium. His testimony makes it certain that it was not the act of a local agent refusing to renew because of such nonpayment, but, speaking for the company of which he was head, he gives an entirely different reason, and that was that, after the payment of the $1,000, they were secure enough without the insurance, and were not looking after Obenchain's business. After such payment, plaintiff was better secured than ever in the repayment to it of premiums, together with 10 per cent. interest, and had nothing to lose by keeping same paid, especially as the loan itself only bore 8 per cent. interest. Having selected itself as the company to carry the insurance, and given Obenchain to understand and believe it was carrying the same, good conscience and fair dealing demanded that he be notified whenever plaintiff wished to give up its benefits and be relieved of its liabilities in the matter. For the reasons given, we hold it was not error to refuse said special charge, and the assignment is overruled.

[5] The third assignment complains of the charge of the court because it assumes that plaintiff selected itself as the company in which Obenchain should carry his insurance. Jalonick, the president of plaintiff company, was also the trustee in the deed of trust, and, in negotiating the loan, he insisted the insurance should be carried in plaintiff company as soon as the then existing policy expired, and there was no error in the court treating it as undisputed that plaintiff company selected itself to carry the insurance after the expiration of the policy then outstanding on the property.

[6] The fourth assignment also attacks the charge. The first proposition is that the charge was erroneous because it uses the word "defendants" instead of "defendant," thereby including Josephine Obenchain. The charge was made more burdensome in every respect upon defendants by using the plural, except where it speaks of plaintiff notifying defendants, and of defendants having notice or knowledge that plaintiff had ceased to carry the insurance. It is true notice to H. L. Obenchain alone would have been sufficient, and, if there was any con-

tention that he had notice or knowledge that plaintiff had ceased to carry the insurance, this charge would have been erroneous as placing the burden upon plaintiff of showing notice to both or knowledge by both. However, it is undisputed that no notice was given Obenchain, and no contention is made by plaintiff that either of the defendants had notice or knowledge, so we consider this error in the charge as harmless. The second proposition is that there is no evidence that plaintiff, by its course of dealing, undertook to attend to the insurance and led Obenchain and wife to believe it would continue to do so. We think the evidence was ample to support the submission of this issue. The third proposition is that the charge leaves out of consideration the duty of Obenchain to pay premiums. We have fully discussed this matter under the third assignment. This assignment is overruled.

[7] By the fifth assignment appellant complains of the admission of the evidence of B. R. Parks, which is stated in our discussion of the first assignment of error. We think this evidence was clearly admissible. It showed the course of dealing by plaintiff with respect to property on which they had liens, with insurance clauses, and showed how plaintiff construed its transaction with Obenchain with respect to the insurance upon his property.

Finding no error in the record, the judgment is affirmed.